IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____

GEORGE PRESLEY, #158 155              *

     Plaintiff,                      *

          v.                      *        2:04-CV-729-WKW
                                               (WO)

GEORGE EDWARDS, CAPTAIN, *et al.*,    *

     Defendants.                     *

_____

## RECOMMENDATION OF THE MAGISTRATE JUDGE

In this 42 U.S.C. § 1983 action, George Presley ["Presley"], an inmate who practices traditional Native American religion, complains that Defendants improperly retained and/or confiscated sacred Native American religious items necessary to the practice of his religious beliefs in violation of the Constitution,[1] the Religious Land Use and Institutionalized Persons Act ["RLUIPA"], 42 U.S.C. § 2000, *et seq.*, and state law.[2]  Presley further complains that

---

[1]In his complaint, Presley asserts that Defendants' conduct violated his rights secured by the First, Fifth, Eighth, and Fourteenth Amendments. In his  opposition to Defendants' dispositive motion, Presley alleges that he has been denied his right to exercise his sincerely held religious beliefs in violation of the Establishment, Free Exercise, and Free Speech Clauses of the First Amendment. (*See* Doc. No. 22.)  Based on the allegations presented in the original complaint as well as the arguments presented in Presley's opposition, however, the court finds that his First Amendment claim is solely based on, and solely supported by, an alleged violation of his right to the free exercise of religion.

[2]Presley specifies in his opposition to Defendants' dispositive motion that his state law claim is brought under the Alabama Religious Freedom Amendment, Amend. No. 622 to § 3, Ala. Const.1901. This amendment provides in the relevant part of Section V: "(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:
"(1) Is in furtherance of a compelling governmental interest; and
"(2) Is the least restrictive means of furthering that compelling interest."
Paragraph 3 of section IV defines "Government," in part, as "[a]ny branch ⋯ instrumentality, [or] official ⋯ of the State of Alabama."

Defendants' conduct is not in compliance with the provisions contained in the consent decree ordered by this court in *Native American Prisoners of Alabama -Turtle Wind Clan v. Alabama Department of Corrections*, Civil Action No. 2:96-CV-554-WHA (M.D.Ala.), consolidated with *Limbaugh, et al., v. Thompson, et al.*, Civil Action No. 2:93-CV-1404-ID (M.D. Ala.).[3] Named as defendants are the Commissioner for the Alabama Department of Corrections,[4] Warden Willie Thomas, Captain George Edwards, Chaplain Steven Smith, Relford Kendrick,[5] and Chaplain Willie Whiting.  Presley seeks injunctive relief, including the return of his Native American religious items, and compensatory and punitive damages as a result of Defendants' conduct.  (Doc. Nos. 1, 22.)

Defendants filed an answer, a special report, a supplemental special report, and supporting evidentiary materials addressing Presley's claim for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to treat the special report, as

---

[3]Although Presley states in his opposition to Defendants' dispositive motion that he does not have access to the *Limbaugh* case and thus cannot comment on or review the case (Doc. No. 42),  Presley specifically referenced the *Limbaugh* opinion in an earlier pleading  and complained that Defendants were knowingly and willfully displaying contempt for the rulings made therein. (Doc. No. 14.)  Presley  indicated that the court's ruling in *Limbaugh*  was made part of the Alabama Department of Corrections' Program Administrative Memorandum Addendum No. 5-98 (Administrative Regulation 333).  (*Id.*)  He alleged, however, that the administrative regulation edited the court's original opinion, and thus, essentially changed the original ruling and agreement reached in  *Limbaugh*.  (*Id.*)  It, therefore, appears that Presley has a rudimentary knowledge of the *Limbaugh* decision.

[4]Presley originally named Commissioner Donal Campbell as a defendant.  Commissioner Campbell has since been succeeded by Commissioner Richard Allen.

[5]Presley originally identified Officer Relford Kendrick as "Ralp Kendrick."

supplemented, as a motion for summary judgment. This case is now pending on Defendants'

motion for summary judgment. Upon consideration of such motion, the evidentiary materials

filed in support thereof, and Presley's opposition to the motion, the court concludes that

Defendants' dispositive motion  is due to be granted in part and denied in part.

## I.  BACKGROUND

On December 4, 2003, Presley states that prison officials unexpectedly transferred

him from the Staton Correctional Facility ["Staton"] to the Draper Correctional Facility

["Draper"]. While inventorying his personal property, Presley contends that a question arose

as to whether he could take his Native American religious articles with him to Draper. He

informed prison staff that, per ADOC regulations, he could retain possession of his personal

religious property.  After discussing the matter  with various prison personnel involved in

effectuating his transfer, Presley asserts that he was granted permission to carry with him to

Draper his medicine bag, one pipe bowl, and one stem.  Presley maintains that prison staff

told him to pack up everything else so that it could either be picked up or shipped out from

the facility. Thereafter,  Presley  returned to the library where the inventory process

continued.  (Doc. No. 1.)

 While in the library, Presley alleges that Defendant Edwards looked at his property,

and specifically at the pipebag and sacred items box, and informed Presley "you can't have

none of that."  After engaging in further discussions with Defendant Edwards regarding the

items of religious property which DOC regulations allowed him to take with him on transfer,

Plaintiff contends that Defendants Edwards stated that he could  take only one pipe and stem

and nothing else.  Defendant Edwards then told Presley to make arrangements for shipment or pick up of his remaining personal property within 30 days or it would be destroyed.  (Doc. No. 1.)

According to Defendants, during Presley's transfer preparations, correctional officials determined that Presley had property in excess of the amount allowed on a transfer between institutions.  Consequently, Defendant Kendrick instructed  Presley to put as much personal property of his choosing as would fit in four grocery-style  bags.  Defendant Kendrick further advised Presley that any remaining property would have to be packed up and placed in the property room for mail out or pick up.  Defendants maintain that after Presley determined which personal effects he wanted to take with him to Draper, he filled four bags with those particular items. Defendant Kendrick  inventoried the items that were to accompany Presley to Draper.  Presley's remaining items of personal property were then  packed into nine boxes which were inventoried and placed in the property room.  Presley's father picked up and signed for the nine boxes of his son's personal property on January 20, 2004.  (Doc. No. 12, Exhs. 1-5.)

Defendants state that Presley took with him to Draper, among other personal effects, one medicine bag and one Native American Pipe. The inventory sheet from Draper shows that he arrived there with these same religious articles as well as the other items he had in his personal possession when he left Staton.  Defendants contend that none of Presley's religious items were confiscated or retained by employees at Staton.  Rather, Defendants maintain that correctional staff allowed Presley to choose the property he wished to take with

him to Draper, including items he needed for the practice and/or observance of his religion and advised him that any remaining personal items and belongings, whether or not religious in nature, had to be packaged and mailed home or picked up by a family member.   (Doc. No. 12, Exhs. 1-5.)

## II.  STANDARD OF REVIEW

To survive Defendants' properly supported motion for summary judgment, Presley is required to produce some evidence supporting his claim of a constitutional violation which would be admissible at trial.  *See* Rule 56(e), *Federal Rules of Civil Procedure*. Specifically, Presley must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  A plaintiff's conclusory allegations do not provide sufficient evidence to oppose a motion for summary judgment. *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-557 (11th Cir. 1984).  Thus, when a plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v.*

*Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving part, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Consequently, where all the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment is appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to any material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). Although factual inferences must be viewed in a light most favorable to the nonmoving party, and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing a genuine issue of material fact.  *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

### III. DISCUSSION

*A. First Amendment Claims*

 *i. Absolute Immunity*

 To the extent Presley seeks to sue Defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity," *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

 In light of the foregoing, it is clear that Defendants are state officials entitled to Eleventh Amendment immunity when sued in their official capacities. Thus, Defendants are entitled to absolute immunity from the First Amendment claims asserted by Presley against them in their official capacities.

 *ii. The Failure to Comply Claim*

 Presley alleges that Defendants acted in such a manner as to violate his constitutional

rights when they refused to allow him to take various religious items with him upon his transfer to Draper on December 4, 2003. Presley maintains that Defendants' conduct violates the Alabama Department of Corrections' Program Services Administrative Memorandum Number 5-98/Administrative Regulation 333 enacted pursuant to legislation in *Limbaugh, et al v. Thompson, et al.*, Civil Action No. 2:93-CV-1404-ID (M.D. Ala.) (*See* Doc. Nos. 14, 17, Doc. No. 22 at pgs. 6, 14.)

To the extent Presley asserts that Defendants violated his constitutional rights by failing to comply with the requirements of the Stipulation filed by the parties on March 5, 1998 in the case of *Limbaugh, supra*, and *Native American Prisoners of Alabama - Turtle Wind Clan v. State of Alabama Department of Corrections*, Civil Action No. 2:96-CV-554-WHA (M.D. Ala.) as set forth in the court's orders in those cases, he is entitled to no relief. The court understands Presley to rely on the Recommendation of the Magistrate Judge entered on September 10, 1999, which recommended that injunctive relief to the inmates be granted "[b]ased on the stipulation which embodies the agreement of the parties on all issues . . . the evidence heard by the court and the record as a whole. . ." *Limbaugh*, Civil Action No. 2:93-CV-1404-ID, Doc. # 193 - September 10, 1999 Recommendation of the Magistrate Judge (adopted as Judgment of the court by final order of June 12, 2000, Doc. # 214). The injunctive relief granted by the court included, but was not limited to, possession of medicine bags, feathers, storage space, maintenance and use of ceremonial grounds, and permission to celebrate particular ceremonial days. *See Id*.

Presley's reliance on the stipulation/consent decree is misplaced because he has failed

to state a claim upon which relief can be granted. A claim asserting a violation of an agreement between the Department of Corrections and the District Court does not raise a federal constitutional or statutory claim and, therefore, Presley is due no relief. Moreover, Presley has failed to seek proper enforcement of either the stipulation or the court's prior orders. Injunctions, including consent decrees, are enforced through the trial court's civil contempt power. See *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). Consequently, Presley has no independent claim of right under the terms of the *Limbaugh*, and *Native American Prisoners of Alabama -Turtle Wind Clan* agreements.

   *iii. The Free Exercise Claim*

   Presley alleges that he has been denied the use of his sacred Native American religious items as a result of their retention and/or confiscation by Defendants upon his transfer to Draper.  Presley contends that the items in question are legal and allowable at both Draper and Staton and are not considered contraband. He maintains that Defendants' conduct denied him the ability to practice his religion and that he will continue to be denied his religious freedoms until the sacred items are returned to him.[6]  (Doc. No. 1 and

---

   [6]Attached to Presley's complaint is a copy of an inventory sheet marked with the notations "Box #9" and "Native American Supplies." (*See* Doc. No. 1, Exhibit A.) This inventory sheet shows that Box #9 contained only religious articles including, but not limited to, feather fans, head bands, sweet grass, various feathers, pipe stems, a deer skin bag, a turkey bone, a smudge bowl, crystals, a medallion, candles, pipe bowls, a wooden spoon, and a deer antler (referred to collectively herein as "religious material," "religious articles," and/or "religious items."). (*Id.*) Additional evidentiary material filed in this case also shows the inventory sheet listing the personal property Presley took with him to Draper. These items included, but were not limited to, stationary and stamps, shower shoes, socks, undershirts, headphones, a wrist watch, a coat, prison whites, four sweat shirts, three sweat bottoms, a dictionary, soap, baby oil, deodorant, five shampoos, four lotions, four towels, a Native American notebook, a medicine bag, a Native American pipe, gloves, a cap, and a pair of black Nike tennis shoes. (Doc. No. 22, Exh. 2.) The inventory sheet completed upon Presley's arrival at Draper shows that he arrived there with these same items. (*Id.* at

Attachments.)        Presley maintains that Administrative Regulation 333 delineates the authorized  religious items Native American practitioners may have and/or retain while in ADOC custody. He argues that all the religious items in his possession at the time of his transfer were considered authorized personal property. As a result, Presley maintains that Defendants had no reason to deprive  him of his "Native American Sacred Property" other than to deny him his religious beliefs and practices.  (Doc. Nos. 22, 42.)

In support of his claim that Defendants' actions substantially burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith, *i.e.*, conduct which is central to the religion's doctrine, without any justification reasonably related to legitimate penological interests, *see Turner v. Safley*, 482 U.S. 78, 89 (1987), Presley submits correspondence he sent to Commissioner Campbell in early January 2004. In this letter, Presley informed the Commissioner that he was allowed to transfer with his medicine bag, one personal pipe bowl, and one personal pipe stem. He goes on to state that numerous other religious articles needed and used in the practice of his religion were deliberately taken from him from him by Captain Edwards.  In his  January 23, 2004 response to Presley's letter, Commissioner Campbell  reiterated the  position taken by Defendants in this action, *i.e.*, that  Presley had the option of which items of personal property he wished to take with him to Draper. In his reply dated February 15, 2004, Presley

---

Exh. 4.)   Presley packaged nine other boxes of personal property which  were subsequently picked up by his father.

stated:

> I at no time was given any option on what I could or could not bring with me on transfer that day.  I was told by the COI's under direct orders from the Captain down thru [sic] the Sergeant what I could have. . .[illegible] . . have given up my clothing, cosmetics, even my toothbrush and toothpaste to have been allowed to transfer with my sacred items. It's that simple.
> I was told what I could and could not bring, there was no option. . . . The Captain directed the Sergeant and the two COI's what he wanted and even though I argued and tried to keep my sacred items, the Captain was very specific and that was that. I am only an inmate and as far as he was concerned that's where it ended.  I had my sacred items taken and I was made to box them up even though it violated the 5-98 provision.

(Doc. No. 22, Attachment 14.)

Presley echoes the same sentiments in an affidavit submitted in support of his opposition to Defendants' dispositive motion.  Specifically, Presley asserts "I was told what I could have and there was no further argument[;] I could take what I was given and nothing more per Captain Edwards."  (Doc. No. 22, Presley Affidavit at pg. 5, *see also* Attachment 10; Doc. No. 42.)

Presley maintains that the religious articles "taken, were not just items, they represent his religion, his way of prayer, and hold an honor, of which is Sacred within itself.  Plaintiff would have given up all his personal property, or anything else to be able to have brought these Sacred items with him on his transfer." (Doc. No. 22 at pg. 12, Presley Affidavit at pg. 6.)  Presley further asserts that the articles of faith he was not permitted to take upon his transfer are his way of honoring and practicing his sincerely held religious beliefs.  (*Id*. Brief at pg. 12.)

The  documents and pleadings in this matter show that this case does not involve a

-11-

dispute over the validity of Presley's sincerely held religious beliefs.  The court also finds that  this case does not represent a  dispute over whether the religious property in question was allowable within the prison system, and specifically, at either Staton or Draper.  For present purposes, the court accepts that Presley is a *bona fide* adherent to the Native American religion and that the  religious articles in question consisted of items allowed by ADOC regulations to be retained within an inmate's personal possession, with a chaplain, and/or at an authorized location within the confines of the prison property.  The question in this case boils down to a dispute over whether correctional officials violated Presley's right to the free exercise of his religion  when they denied and/or restricted his ability to keep in his possession authorized religious items  of his choosing at the time of his transfer to Draper.  Defendants claim Presley was given a choice as to which personal effects he wished to take with him to Draper. Presley contends he did not have a choice in the matter.  Presley maintains that Defendants' conduct impermissibly infringed on his ability to engage in the free exercise of his religion.  (Doc. Nos. 1, 22, 42.)

Because prisoners retain Constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner,* 482 U.S. at  84  (quoting *Procunier v. Martinez,* 416 U.S. 396, 405-06 (1974)).  However, "maintaining institutional security and preserving internal discipline are essential goals that may require limitation or retraction of the retained constitutional rights." *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). As the Court noted in *Turner:*

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez,* additional reason to accord deference to the appropriate prison authorities.

*Id.* 482 U.S. at 84-85.

The proper inquiry in those cases where a prison regulation impinges on an inmate's constitutional rights is whether the regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89 (establishing this standard and applying it to a prison policy prohibiting correspondence among inmates of different institutions); *Thornburgh v. Abbott,* 490 U.S. 401, 404, (1989) (applying this analysis to a prison policy allowing the warden to reject publications sent to inmates in certain circumstances). This "reasonableness" test is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Shabazz,* 482 U.S. 342, 347-49 (1987) (holding that the *Turner v. Safley* standard of review is applicable to claims that an inmate's free exercise rights have been violated).

In *Turner*, the Supreme Court delineated four factors relevant to determining whether a prison regulation infringes on a prisoner's constitutional rights: (1) is there a valid, rational correlation between the prison regulation and the legitimate governmental interest advanced; (2) are there alternative means of exercising the rights that remain available to the prisoner; (3) what is the impact of an accommodation in favor of the inmate on prison staff, other

-13-

prisoners, and the allocation of prison resources generally; and (4) do alternatives exist that would accommodate the prisoner's rights at little cost to valid prison interests. *Id*. 482 U.S. at 89-91.

As the foregoing discussion shows, there are material questions of fact with regard to Presley's free exercise claim insofar as it concerns the alleged denial of the Native American religious articles he wanted to take with him to Draper.  Presley argues that Defendant Edwards specifically prohibited him from taking with him desired sacred items.[7] He has submitted evidence that the religious items he was forced to leave at Staton, including but not necessarily limited to a heartbag/pipebag and sacred  ceremonial pipe, are of significant importance to the practice of his faith.  Defendants' dispositive motion does not dispute that the religious articles Presley maintains he had to leave at Staton are central and important to his spiritual beliefs and observances.[8]  They do dispute Presley's contention that he was prohibited from taking any  items of religious property with him. As noted,

---

[7]The court finds from the pleadings before it  that Presley specifically identifies Captain Edwards as the prison official who imposed  the restrictions on and/or denied him the ability to choose the items of religious property he wished to take to Draper and that subordinate officers simply followed the orders given to them by a superior officer. It is also clear from the pleadings submitted herein that Defendants Campbell, Whiting, Smith, and Thomas, pursuant to Presley's requests,  investigated  his complaints about the denial of his religious property.  The fact that they were not successful in securing for Presley  the relief he sought  does not mean that these defendants violated his constitutional rights.

[8]The inventory list attached to Presley's complaint contains a variety of  items which he maintains are religiously significant.  The validity of these items with regard to whether they are actually necessary for Presley's religious practice  or  whether they are more ceremonial in nature is not entirely clear to the court notwithstanding the N.A.P.O.A. Handbook Presley attaches to his opposition.  (Doc. No. 22, Exh. V.)  Because Presley maintains, however, that Defendant Edwards refused to make himself aware of  the religious articles Presley wished to take with him to Draper, the court declines to address the validity of the religious significance of each item appearing on the inventory list of Presley's religious property.  (Doc. No. 1, Exh. A.)

-14-

Defendants maintain that Presley made the choice of what property to take with him when he transferred to Draper.

    *iv.  Defendants  Thomas, Smith, Whiting, Campbell, and Kendrick*

It is undisputed that Warden Thomas, Commissioner Campbell, Officer Kendrick, and Chaplains Whiting and Smith were not involved in the actions concerning the religious articles about which Presley complains. The language of 42 U.S.C. § 1983 requires proof of an affirmative causal connection between the actions taken by a defendant and the alleged constitutional deprivation. *Swint v. City Wadley,* 51 F.2d. (11th Cir. 1995); *Jones v. Preuit & Mauldin*, 851 F.2d 1321 (11th Cir. 1988). The requisite causal connection may be shown by the personal participation of the defendant, a policy established by the defendant resulting in indifference to constitutional rights, or a breach of duty imposed by state or local law which results in constitutional injury. *Zatler v. Wainwright,* 802 F. 2d 397 (11th Cir. 1986). Presley has come forward with no evidence demonstrating existence of the requisite causal connection with respect to his claims against Defendants Thomas, Campbell, Kendrick, Smith, and Whiting.

To the extent Presley maintains that Defendants Thomas and Campbell are liable for the actions of a correctional officer due to their supervisory roles, his claims must likewise fail. The law is well settled that a defendant cannot be held liable in an action brought pursuant to 42 U.S.C. § 1983 under the theory of *respondeat superior* or on the basis of vicarious liability. *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990); *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th

Cir. 1986).  In light of the foregoing, the court concludes that Defendants Thomas, Campbell, Smith, Kendrick, and Whiting's motion for summary judgment with respect to Presley's First Amendment and *respondeat superior* claims  is due to be granted.

>    *v. Defendant Edwards*

The court reviews  Presley's First Amendment claim against Defendant Edwards by turning its attention to the first *Turner* factor.  This factor counsels that there be a valid, rational connection between a prison regulation and the governmental interest advanced. There certainly exists a legitimate penological interest in controlling which items an inmate may possess as personal  property, whether or not religious in nature.  The court cannot, however, discern a legitimate penological purpose for imposing an arbitrary ban on an inmate's ability to transfer with  religious property not disputed as being legal and allowable. Undoubtedly, legitimate security concerns may exist with respect to who should maintain custody of certain  religious items or supplies and the location where such property may be stored or housed which in turn necessitates a prohibition of  their transfer  as part of an inmate's personal property.  In this matter, however, there is a question of fact as to whether this was actually the case with respect to some or all of the religious items Presley wished to take with him to Draper. *See Werner v. McCotter*, 49 F.3d 1476, 1480 (9th Cir. 1996) ("'[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety to establish that its interests are [compelling].'") (quoting *Weaver v. Jago*, 675 F.2d 116, 119 (6th Cir. 1982.)  This factor, therefore,  favors neither party.

With regard to the second *Turner* factor, Presley does appear to have alternative means available to practice his religion other than through the articles he maintains he could not take with him to Draper. He admits that other inmates at Draper who practice the Native American religion provided him with various religious articles for purposes of allowing him to engage in the practice of his religion. He further states, however, that he had to forego observance of certain important ceremonies central to his faith due to the absence of necessary sacred items, that some of his religious property is not generally available on the ceremonial grounds, and that having to buy religious items or have them given to him by other inmates takes away from the "spiritualness of the individual person and item." (*See* Doc. No. 22, Exhs. D-I; Doc. No. 42 at pg. 20.) This factor appears to weigh in favor of Defendant Edwards albeit only marginally given the manner in which Presley was required to alternatively secure religious articles to practice his religion .

Regarding the third *Turner* factor, it is unclear what impact the accommodation of the asserted constitutional right will have on the guards, inmates, and allocation of prison resources. Presley does not dispute any argument made with regard to prison security concerns which require that certain Native American religious items be stored only on the ceremonial grounds or by the prison chaplain. Rather, Presley argues not only that Defendant Edwards was unaware of the particular items he wished to take with him on the transfer (other than the three items which were specifically allowed), but also that the religious articles he wished to take with him were considered allowable personal property among inmates of the Native American faith. (Doc. No. 22 at pg. 15, Presley Affidavit; Doc.

No. 42.)  This factor favors neither party.

Fourth, the existence of ready alternatives is unknown to the court. Given the presence of factual issues concerning Defendant Edwards' position that Presley was free to choose which items of personal property he wished to take with him to Draper,  the question  of ready alternatives turn on issues of fact that must be resolved at trial.

The court is cognizant of the fact  that prison officials are afforded great deference in formulating policies relating to the security of prison facilities.   Given the questions that remain, however, with respect to the nexus, if any, between the  challenged conduct and the asserted  penological interests,   and  viewing  the  evidence  presented  in  the  light  most favorable to Presley, Defendant Edwards' request for summary judgment is due to be denied with respect to Presley's  First Amendment free exercise claim.

   *vi.  Claims for Injunctive Relief.*

The actions about which Presley complains occurred at Staton and he is no longer housed at that facility.  An inmate's  transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.  *See  County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Murphy v. Hunt,* 455 U.S. 478, 481-82 (1982); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury).  When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.  *But see Green v. Mansour,* 474 U.S. 64, 71 (1985).  *See*

*also Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 420 (1977) ("'Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation."'") (quoting *Hills v. Gautreaux,* 425 U.S. 284, 293-94  (1976) (citations omitted) (quoting *Milliken v. Bradley,* 418 U.S. 717,  744(1974)).

At this juncture, Presley remains without most of his  religious property which he had in his possession at Staton, some or all of which are alleged to be significant to the practice of his sincerely held religious beliefs. Given the ongoing nature of the constitutional violation at issue, grounds may exist which justify an entry of injunctive and/or declaratory relief against Defendant Edwards with respect to Presley's request that the Native American religious items listed in Exhibit A of his complaint be returned to him. Other than this exception, the court finds Presley's remaining requests for injunctive and/or declaratory relief against Defendant Edwards moot.

*vii.  Qualified Immunity*

Defendant Edwards argues that he is entitled to qualified immunity from monetary liability with respect to Presley's First Amendment Claim.   "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The doctrine "'gives public officials the benefit of legal doubts.'" *Id*. at 951 (citation omitted).   In order to be entitled to qualified immunity, a public official defendant must first prove that he was acting within the scope of his or her discretionary authority at the time of the allegedly unconstitutional conduct.  *Lee v. Ferraro*, 284 F.3d 1188, 1192 (11th Cir. 2002). If the

defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity. *Id*. at 1194.   Here, the court finds that Defendant Edwards was acting in his discretionary capacity at the time the conduct complained of occurred.

Qualified immunity will shield defendants "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hope v. Pelzer*, 536 U.S. 730, 739  (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation," *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002), by ensuring that only "the plainly incompetent or those who knowingly violate the law" are subjected to liability. *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir.2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir.1998) (citation omitted). If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991)..

Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Vinyard*, 311 F.3d at 1346. The Supreme Court has established a two-part approach for the qualified immunity analysis. "The threshold inquiry a court must undertake . . . is whether

plaintiff's allegations, if true, establish a constitutional violation." *Id.* (quoting *Hope*, 536 U.S. at 736).  If a court finds the violation of a constitutional right under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.[9]  To determine whether a right is clearly established under the second step, courts examine cases that articulate constitutional rules of general application as well as those cases that apply these general rules in circumstances similar to those encountered in the case at hand. *See Vinyard*, 311 F.3d at 1350-52. In so doing, courts are not to be unduly rigid in requiring factual similarity between prior cases and the case under consideration. The "salient question" is whether the state of the law gave the official "fair warning" that the alleged conduct was unconstitutional. *See Hope*, 536 U.S. at 740-41. *See also Dominguez v. Metropolitan Miami-Dade County,* 167 Fed.Appx. 147, *149, 2006 WL 334243, **2 (11th Cir. 2006).

> This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. We look to case law to see whether "the right the official is alleged to have violated [has] been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted); see also *Hope*, 536 U.S. at 741, 122 S.Ct. at 2516 ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning

_____

[9]"A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier* , 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

that their alleged treatment of [the plaintiff] was unconstitutional."). Thus, "fair and clear notice to government officials is the cornerstone of qualified immunity." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir.2002) (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1031 (11th Cir.2001) (*en banc*)).

*Bashir v. Rockdale County, Ga.,* 445 F.3d 1323, 1330 -1331 (11th Cir. 2006).

The requisite "fair and clear notice" may be given in various ways.  *Marsh*, 268 F.3d at 1031.  In rare cases, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* More frequently, however, we must look to case law existing at the time of the violation to see if the right was clearly established. *Id.* at 1351. "While 'some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts,' more often, the facts are so material to the violation at issue that such generalized principles are insufficient, and we must look to precedent that is factually similar to the case at hand." *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir.2003) (quoting *Vinyard*, 311 F.3d at 1351).

Although the facts at trial might show otherwise, at this stage, the unresolved factual allegations as viewed in the light most favorable to Presley  show a violation of his free-exercise rights as a result of Defendant Edwards' conduct which prohibited Presley from possessing  legal and allowable religious items of his choosing at the time of  his transfer to Draper for no legitimate and/or permissible reason. Taking this allegation as true, as this court must,  Presley has demonstrated a  violation of his First Amendment free-exercise

rights. Qualified immunity is not appropriate at this stage because it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to the free exercise of religion without some legitimate penological justification and because the court cannot say as a matter of law that it was objectively reasonable for Defendant Edwards to believe that the facts as they stand on summary judgment showed no violation of a clearly established right. Accordingly, this issue remains to be resolved in further proceedings and summary judgment on Defendant Edwards' request for qualified immunity is inappropriate.

## B. RLUIPA

Under RLUIPA, prisons that receive federal funding are prohibited from substantially burdening a prisoner's exercise of religion unless the prison has a compelling interest and employs the least restrictive means possible for protecting that interest.[10]    *See Lindell v.*

---

[10]In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court held that the Religious Freedom Restoration Act ["RFRA"], 42 U.S.C. § 2000bb, *et seq*., was unconstitutional as exceeding Congress' authority under the Constitution. The *Flores* decision required returning to the standard of review employed in *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872 (1990), and in the context of prison cases, *O'Lone v. Shabazz, supra*. Following the Court's decision in *Flores*, Congress enacted the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000bb, *et seq*., ["RLUIPA"]. Congress enacted RLUIPA, in part, to protect inmates and other institutionalized persons from substantial burdens in freely practicing their religions. Specifically, RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person:

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

*McCallum,* 352 F.3d 1107, 1109-10 (7th Cir. 2003).   "Substantial burden" in the context of RLUIPA has been found when a regulation has "a tendency to coerce individuals into acting contrary to their religious beliefs," *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988),  or when government puts  substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 489 U.S. 136, 141 (1987); *see also   Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 717-18 (1981).   As the Supreme Court noted in *Cutter v. Wilkinson*,  544 U.S. 709, 722 (2005), however,  RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety . . . An accommodation must be measured so that it does not override other significant interests."

In concluding that serious questions exist as to whether Captain Edwards' denial of Presley's request  to take various religious articles with him when he transferred to Draper was reasonably  related to the ADOC's legitimate interest in prison  security and space limitations within the penal institutions, these same questions  preclude summary judgment under RLUIPA's requirement that a substantial burden of free exercise be in furtherance of a compelling governmental  interest and that the burden imposed was the "least restrictive means" of furthering that interest.  42 U. S. C. § 2000cc-1(a)(1)-(2).  Accordingly, summary judgment is denied with respect to Plaintiff's claim against Defendant Edwards under

---

42 U.S.C. § 2000cc-1(a) (2000).

RLUIPA.[11]

### i. Sovereign Immunity

As the court previously mentioned, an official-capacity suit is an alternative method of "pleading an action against an entity of which the officer is an agent." *Kentucky v. Graham*, 473 U.S. at 165-66; *LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993). Thus, an official-capacity suit against individual defendants should be treated as a suit against the entity. *Will v. Michigan Dept. of State of Police*, 491 U.S. 58, 71 (1989); *LaMarca*, *supra*. Therefore, Presley's claim against Defendant Edwards in his official capacity is essentially a claim against the Alabama Department of Corrections, an agency of the State.

The court recognizes that Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA. *Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004). The Act specifically provides that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The statutory definition

---

[11]In *Cutter*, 544 U.S. 709, 720, the Court held that section 3 of RLUIPA, on its face, qualifies as a permissible legislative accommodation of religion that is not inconsistent with the Establishment Clause of the First Amendment. Further, several courts have held that RLUIPA falls within acceptable constitutional parameters. *See Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) (spending and commerce clauses); *Mayweathers v. Newland*, 314 F.3d 1062, 1066 (9th Cir. 2002 )(spending clause); *Williams v. Bitner*, 285 F. Supp.2d 593 (M.D. Pa. 2003 ) (spending clause); *Murphry v. Zoning Comm'n of the Town of New Milford*, 289 F. Supp.2d 87, 117-121 (D. Conn. 2003) (§ 5 of the Fourteenth Amendment); *Johnson v. Martin*, 223 F. Supp.2d 820 (W.D. Mich. 2002) (spending and commerce clauses); *Gerhardt v. Lazaroff*, 221 F. Supp.2d 827 (S.D. Ohio 2002) (spending and commerce clauses).

of "government" specifically includes states and state agencies. 42 U.S.C. § 2000cc-5(4)(A). A state's waiver of sovereign immunity from suit, however, does not necessarily waive immunity from monetary damages. A waiver of a state's Eleventh Amendment immunity will be found "only where stated 'by the most express language or by such overwhelming implication from the [statutory] text as [will] leave no room for any other reasonable construction.'" *Fouche v. Jekyll Island-State Park Authority*, 713 F.2d 1518, 1522 (11th Cir. 1983) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (11th Cir. 1993).

The State of Alabama has not expressly waived its immunity to damages with respect to RLUIPA claims. Moreover, although it is clear that RLUIPA requires the State and its agencies to waive their sovereign immunity from suit, the reference to "appropriate relief" in section 2000cc-2(a) is not the kind of unambiguous waiver necessary to subject the ADOC and the individual defendant in his official capacity to liability for damages. *See James v. Price*, 2005 WL 483443 *2 (N.D. Tex. 2005). *Cf. Tinsley v. Pittari*, 952 F. Supp. 384, 389 (N.D. Tex. 1996) (holding that RFRA's reference to "appropriate relief" did not waive sovereign immunity with respect to claims for monetary damages). Consequently, to the extent Presley seeks monetary relief against the Alabama Department of Corrections and Defendant Edwards in his official capacity, his claims are barred by the Eleventh Amendment.

*ii. Qualified Immunity*

Whether Defendant Edwards is liable in his individual capacity for damages under RLUIPA is currently unsettled in this and other circuits. *See Smith v. Haley*, 401 F. Supp.

2d 1240, 1246 (M.D. Ala. 2005) ("Because there is simply nothing in the statute that clearly suggests that government employees can be liable for damages in their individual capacities, the court doubts that RLUIP[A] provides for such."); *see also Gooden v. Crain*, 405 F. Supp.2d 714  (E.D. Tex. 2005) (appearing to hold claims for damages, especially those against officials in individual capacities, unavailable under  RLUIPA); *Boles v. Neet*, 402 F. Supp.2d 1237, 1240 (D. Colo. 2005)  ("The Court understands [RLUIPA] to permit cases against a governmental entity, but not against an individual officer, except perhaps in his or her official capacity," and the appropriate relief  permitted is limited to injunctive or declaratory relief, or both.);  *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F. Supp.2d 1140, 1162 (E.D. Cal.2003) ("the issue of whether RLUIPA allows the recovery of damages is an open question"); *Chase v. City of Portsmouth*,  2005 WL 3079065, at \*5 (E.D. Va. Nov. 16, 2005) ("Appropriate relief may include injunctive and declaratory relief as well as nominal damages."); *Farrow v. Stanley*, 2005 WL 2671541, at \*11 n. 13 (D.N. H. Oct. 20, 2005) ("There is substantial uncertainty ... as to whether [42 U.S.C. § 2000cc-2] even provides a right to money damages."); *Agrawal v. Briley*, 2003 WL 164225, at \*2 n. 2 (N.D. Ill. Jan. 22, 2003) ("it is unclear whether [42 U.S.C. § 2000cc-2(a)] authorizes a claim for damages as well as injunctive relief"). *But see Williams v. Bitner*, 359 F. Supp.2d 370 (M.D. Pa.2005) (recognizing corrections employees and officials' exposure to liability in individual capacities on inmate's § 1983 claim asserting violation of  RLUIPA); and *Daker v. Ferrero, et al.*, 2006 WL 346440 at \* 9-10 (N.D. Ga. Feb. 13, 2006) (reading RLUIPA's provisions  to permit suit against state officials in their individual capacities on inmate's §

1983 claim asserting violation of RLUIPA). Because the issue continues to be unresolved, and assuming, *arguendo*, that RLUIPA's provisions provide for damage liability against Defendant in his individual capacity, the court finds that Defendant Edwards could reasonably have believed that his conduct did not expose him to liability in his individual capacity under RLUIPA. *Smith*, 401 F. Supp.2d at 1246; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Consequently, the court finds that Defendant Edwards is entitled to qualified immunity on the issue of liability for damages in his individual capacity with respect to Presley's claim under RLUIPA.

## C. The Due Process Claim

To the extent Presley complains that Defendants improperly confiscated his religious property in violation of his right to due process, the court finds that he is entitled to no relief.

> "If the [property] was not returned because of [Defendants']
> negligence, there has been no unconstitutional deprivation of
> property. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662,
> 88 L.Ed.2d 662 (negligent loss of property does not rise to the
> level of a constitutional violation.) If [Defendants] intentionally
> refused to return the [property], plaintiff has not alleged a
> constitutional violation. In *Hudson v. Palmer* the Court ruled
> that an 'unauthorized intentional deprivation of property by a
> state employee does not constitute a violation of the Due
> Process Clause . . . if a meaningful post-deprivation remedy for
> the loss is available.' 104 S.Ct. at 3202, 82 L.Ed.2d at 407. It
> is essential to [the instant] complaint that it allege that
> [Defendants] acted without authorization. If [Defendants]
> w[ere] acting pursuant to authorization, ]their] actions would be
> within the outer perimeter of [their] duties and would not have
> violated any clearly established constitutional right and
> therefore [they] would be immune from suit. *See Scheuer v.*

> *Rhodes,* 416 U.S. 232, 247-48, 94 S.Ct. 1683, 1691-92, 40
> L.Ed.2d 90 (1974); *Flinn v. Gordon,* 775 F.2d 1551, 1553 (11th
> Cir.1985).  Only if the complaint is construed as alleging that
> [Defendants] w[ere] acting in bad faith outside the scope of
> [their] duties can it evade the doctrine of official immunity.

*Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986). *See also Holloway v. Walker*, 790 F.2d 1170, 1173-74 (5th Cir. 1986) (finding no breach of federally guaranteed constitutional rights, even where a high level state employee intentionally engages in tortuous conduct, as long as the state system as a whole provides due process of law); *Myers v. Klevenhagen*, 97 F.3d 91, 94-95 (5th Cir. 1996) ("the *Parratt* [*v. Taylor*, 451 U.S. 527 (1981)]/*Hudson* [*v. Palmer*, 468 U.S. 517 (1984)] doctrine protects the state from liability for failing to provide a pre-deprivation process in situations where it cannot anticipate the random and unauthorized actions of its officers."  The complainant bears the burden of establishing that the state's post-deprivation remedy is inadequate).

The State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for Plaintiff to seek redress for the loss of his property. *Ala. Code* § 41-9-60 *et seq*. (1982).  In light of this adequate state  remedy, Plaintiff's allegation that Defendants violated his due process rights by improperly confiscating his personal religious property, whether such was the result of negligence or an intentional act, fails to state a claim for relief. *See Neitzke v. Williams*, 490 U.S. 319 (1989).

*D.  The Property Claim*

Presley complains that prison officials impermissibly confiscated and/or withheld from him two packages containing Native American supplies.  The packages apparently

arrived at Staton after Presley was transferred from that institution.  Presley admits that he subsequently received the packages. (Doc. Nos. 1, 22.)  Accordingly, his request for injunctive relief on this claim is  moot. *See Flast v. Cohen,* 392 U.S. 83, 95 (1968) ("Where the question sought to be adjudicated has been mooted by developments subsequent to filing of the complaint, no justiciable controversy is presented."); *County of Los Angeles v. Davis*, 440 U.S. 625 (1979); *Cotterall v. Paul*, 755 F.2d 777 (11th Cir. 1985).

Insofar as Presley's damages request on this claim is concerned,  the law is well settled that the Constitution is not implicated by negligent acts of an official causing unintended deprivation of life, liberty or property.[12]  *Daniels*, 474 U.S. 327.  Here, Presley's complaint regarding the property in question, at best, shows only a lack of due care by prison officials which is not actionable under 42 U.S.C. § 1983.  The protections of the Constitution "are just not triggered by lack of due care by prison officials."  *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Daniels*, 474 U.S. at 333.

*E.  The Equal Protection Claim*

Presley complains that Defendants violated his right to equal protection during his transfer proceedings from Staton to Draper. Equal protection principles require generally that government officials behave in a way such  "that all persons similarly situated should be treated alike."  *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). Thus, in order to establish a claim cognizable under the Equal Protection Clause, a claimant must,

---

[12]There is no evidence before the court to indicate that the retention  of Presley's  property resulted from anything more than mistake or inadvertence.

at the very least, allege that he is similarly situated with other persons who were treated differently and that the reason for the differential treatment was based on a constitutionally protected interest. *Jones v. Ray*, 279 F.3d 944, 947 (11th Cir. 2001); *Damiano v. Florida Parole and Probation Com'n*, 785 F.2d 929, 932-33 (11th Cir. 1986). Inconsistency in the operation of a prison may not, in itself, constitute a denial of equal protection. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977); *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir. 1993); *E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987).

> [O]fficial action will not be held unconstitutional solely because it results in a . . . disproportionate impact. . . . Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). Evidence which merely indicates disparity of treatment or erroneous or even arbitrary administration of state powers, rather than against instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Since this case is before the court on a properly supported motion for summary judgment from Defendants, Presley bears the burden of producing some evidence to show that he was the victim of intentional discrimination. *Celotex*, 477 U.S. at 322-24. *Waddell*,

276 F.3d at 1279.  Presley, however, fails to meet this burden as he has offered no evidence identifying any other similarly situated inmate who received more favorable treatment from Defendants. *Brunskill v. Boyd*, 141 Fed.Appx. 771, 776 (11th Cir. 2005) (district court did not err in granting summary judgment on equal protection claim as inmate "offered no evidence that other similarly situated prisoners were treated more favorably."); *Norvell v. State of Ill.,* 373 U.S. 420, 423 (1963) ("Exact equality is no prerequisite of equal protection of the laws within the meaning of the Fourteenth Amendment.").

Here, Presley does not allege that he has been subjected to any tangible unequal treatment by Defendants' actions such as the conduct complained of as being based upon a constitutionally protected interest.  Other than Presley's  conclusory allegation that Defendants' conduct violated his equal protection rights, the record is devoid of any evidence that Defendants acted in a discriminatory manner.  Summary judgment is, therefore, due to be granted in favor of Defendants on this claim.

*F. The Conspiracy Claim*

Presley alleges that Defendants  conspired to violate his First Amendment  rights. To state a claim of conspiracy to violate civil rights, "a plaintiff 'must show that the parties "reached an understanding" to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy.' *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991). . . . [T]he linchpin for conspiracy is agreement . . ." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir.  1992).  In order for a plaintiff "to establish the 'understanding'

or 'willful participation' required to show a conspiracy, . . . [he] must [produce] some evidence of agreement between the defendants. . . .  For a conspiracy claim to survive a motion for summary judgment '[a] mere "scintilla" of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party.' *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990)." *Rowe v. City of Fort Lauderdale,* 279 F.3d 1271, 1283-1284 (11th Cir. 2002).  Merely "stringing together" adverse acts of individuals is insufficient to demonstrate the existence of a conspiracy. *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992).

The court has carefully reviewed the pleadings filed by Presley.  There is a total lack of evidence to support his theory that Defendants conspired to deprive him of his constitutional rights.  Presley fails to present any evidence which demonstrates that Defendants "reached an understanding" to violate his rights or committed an "actionable wrong to support the conspiracy." *Bailey*, 956 F.2d at 1122; *Bendiburg*, 909 F.2d at 468. At best, Presley's assertions are self-serving,  conclusory allegations that fail to assert those material facts necessary to establish a conspiracy between Defendants. *See Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984).  Presley, therefore, fails to produce requisite evidence of a conspiracy, and summary judgment is due to be granted in favor of Defendants on this claim. *Bailey*, 956 F.2d at 1122.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for summary judgment filed on behalf of Defendants Thomas, Campbell, Kendrick, Whiting, and Smith  (Doc. Nos. 12, 41), be GRANTED and the claims asserted against these Defendant be DISMISSED with prejudice;

2. The motion for summary judgment filed on behalf of Defendant Edwards with respect to Plaintiff's due process, property, equal protection,  and conspiracy claims  (Doc. Nos. 12, 41), be GRANTED and these claims asserted against Defendant Edwards be DISMISSED with prejudice;

3. Defendants Thomas, Campbell, Kendrick, Whiting, and Smith be DISMISSED as parties to this cause of action;

4. Defendant Edwards' motion for summary judgment on Plaintiff's federal and state First Amendment claims (Doc. Nos. 12, 41) be DENIED;

5. Defendant Edwards' motion for summary judgment on Plaintiff's First Amendment and RLUIPA claims (Doc. Nos. 12, 41) be DENIED with respect to Plaintiff's claim for injunctive relief as it concerns his request for return of his Native American items listed on Exhibit A of Document Number 1 and that the motion for summary judgment be GRANTED with respect to the remaining requests for injunctive and/or declaratory relief;

6. Defendant Edwards be qualifiedly immune to Plaintiff's demand for money damages on his  RLUIPA claim;  and

7.  Consistent with the findings in this Recommendation, Plaintiff's claims that Defendant Edwards violated his First Amendment right to the free exercise of his religion

and violated the Religious Land Use and Institutionalized Persons Act by denying him access to religious property central to his Native American religion at the time of his transfer to Draper be SET for a jury trial.

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before **December 21, 2006**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done, this  4th day of December, 2006.


/s/ Wallace Capel, Jr.

UNITED STATES MAGISTRATE JUDGE