IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GEORGE PRESLEY #158155, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:04-cv-729-WKW |
| | ) | [wo] |
| GEORGE EDWARDS, CAPTAIN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the court on defendant George Edwards's ("Edwards") Motion for Summary Judgment (Doc. # 119). In a previous memorandum opinion and order (Doc. # 49), the court dismissed plaintiff George Presley's ("Presley") claims against other defendants and some of his claims against Edwards. The court found that Edwards was not entitled to qualified immunity as to Presley's free exercise claim and that Presley had stated a claim for injunctive relief under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. In the present motion, Edwards asks the court to revisit those determinations. Because the plaintiff waived his claim for injunctive relief under RLUIPA at the pretrial conference on February 14, 2008, the only issue remaining for resolution is whether Edwards is entitled to qualified immunity. For the reasons set forth below and for the reasons contained in the court's earlier summary judgment opinion, the court finds that Edwards is not entitled to qualified immunity, and the motion is due to be DENIED.

## I.  FACTS AND PROCEDURAL HISTORY

The earlier Report and Recommendation (Doc. # 47) of the Magistrate Judge recited the facts of the case.  However, because discovery has occurred since then, the court will briefly reiterate them.

Presley is an inmate who, on December 4, 2003, was unexpectedly transferred from Staton Correction Facility ("Staton") to Draper Correctional Facility ("Draper").[1]  Edwards is employed by the Alabama Department of Corrections ("ADOC") as the captain of security at Staton.  (Edwards Dep. 32:22-33:12.)  When a prisoner is being transferred to a new prison, his possessions are inventoried to ensure that the inmate does not have contraband.  (*Id.* 82:18-23.) According to prison regulations, a transferring inmate must bring his property in no more than four paper bags.  (*Id.* 76:14-19.)  For convenience, Presley was allowed to transfer his items in one laundry bag.  (*Id.* 81:20-82:11.)  Problems arose during Presley's inventory because he had more personal property than was allowed in a transfer, including Native American religious items and eight boxes of hobby craft items.

The corrections officer who was overseeing Presley's inventory contacted Edwards about the excess property.  Initially, Edwards told the corrections officer that Presley could not take the hobby craft items with him, but after learning that Presley's property included Native American religious items, Edwards came to the law library where Presley's items were being inventoried.  (*Id.* 71:10-72:5.)  Presley contends that when Edwards arrived,

---

[1] The parties do not know why Presley was transferred.  (Edwards Dep. 74:14-15.)

Edwards looked over Presley's property and told him to pack it up because he could not take it to Draper. (Presley Dep. 117:11-17.) Presley claims he informed Edwards that an ADOC regulation allowed him to be transferred with his religious items but that Edwards refused to allow him to bring his religious items. (*Id.* 118:8-13.) As a result Presley was not allowed to take, among other items, his feather box[2] and heart bag[3] with him to Draper. Presley left eight boxes containing hobby craft items and a ninth box holding his religious items at Staton when he was transferred.

Presley also contends that he was not permitted to take his pipe with him to Draper. Presley claims that he was initially told that he could take his personal pipe. (*Id.* 176:13-15.) However, when Presley informed the officer that he also needed to bring the pipe bag to protect the pipe, the officer disallowed it and instead directed Presley to bring an unfinished pipe with him.[4] (*Id.* 175:4-7; 176:13-177:6.) Edwards denies telling Presley that he could not bring his religious items with him. Instead, Edwards states that he told Presley he could bring one laundry bag worth of items, that Presley chose which items to bring, and that Presley decided to abandon his religious items. Presley counters that had Edwards allowed him to bring his religious items, he would have fit them in the extra space in his laundry bag.

---

[2] The feather box is a cedar box, which is about 20 inches long. (Presley Dep. 100:4-7.) Presley had feather fans, head bands, sweetgrass, braids, leather thongs, pipe rests, a stone necklace, tobacco stones, candles, stems, bowls, feathers, and a turkey bone in his feather box. (*Id.* 110:4-17.)

[3] The heart bag is approximately twelve inches by eighteen inches. (Presley Decl. ¶ 4.)

[4] A functioning pipe consists of two parts: a stone pipe and a wooden stem. The pipe that the corrections officer directed Presley to bring with him was unfinished. There is no evidence in the record establishing whether the prison official knew that the pipe was unfinished.

3

(Presley Decl. ¶ 5.)

Presley claims that Edwards violated ADOC policy by denying him access to his religious items. Presley points to Program Services Administrative Memorandum Number 5-98 ("Memorandum 5-98") (Pl's Ex. 7), which governs what spiritual items inmates who practice Native American spirituality can possess. There is ongoing litigation in this district regarding ADOC policies governing inmates who practice Native American spirituality, and Memorandum 5-98 had its genesis in that case. *See Limbaugh v. Thompson*, No. 93-1404 (M.D. Ala.) Memorandum 5-98 "permit[s] inmates to keep and retain their religious items in the event they are transferred from one facility to another." (Pl.'s Ex. 7 ¶ 20.) This regulation also governs what religious items inmates who practice Native American spirituality can possess and where they can possess them. They can possess feathers: "[ADOC] shall not prohibit Native American inmates from possessing feathers for religious and ceremonial use. Feathers must be kept in the personal property box in the cell or dormitory. . . . Inmates shall be allowed to keep and maintain with their personal possessions personal prayer fans for use on the ceremonial grounds." (*Id.* ¶ 10.) They can also keep personal prayer pipes among their personal property: "Native American inmates shall be allowed to keep and maintain a personal prayer pipe . . . . [ADOC] shall permit inmates, according to each inmate's personal preference, to keep the pipes *with the personal possessions of the inmate*, at the ceremonial grounds, in the area specifically provided for Native American activities, or with the Chaplain." (*Id.* ¶ 12 (emphasis added).)

Additionally, they may keep a box to store their religious items: "[ADOC] shall not prohibit Native American inmates from maintaining a sacred item box in their personal possession so long as the size of such box allows it to be kept within the inmate's locker box or personal possession." (*Id.* ¶ 21.) They can possess certain herbs, but the regulations require the chaplain or another prison official to maintain control over the items: "The DOC shall permit Native American inmates to purchase the following herbs through the Chaplain's office except tobacco: Sage, Sweetgrass, Cedar, Kinnickinnick and Tobacco. All herbs, except tobacco, are to be maintained and kept by the Chaplain or in the Shift Commander's office." (*Id.* ¶ 13.) Finally, they are allowed to possess certain ceremonial items on ceremonial grounds: "The DOC shall permit inmates to possess colored ceremonial items, such as arm bands, chokers, and headbands for use in religious practice. . . . The DOC shall require such items to be kept on the ceremonial grounds." (*Id.* ¶ 15.)

After Presley was transferred to Draper, he claims he was unable to participate fully in religious ceremonies because he did not have his religious items, including his pipe and feathers. Presley finished his pipe eight months after he was transferred. (Presley Dep. 163:9-12.) While another inmate loaned Presley feathers, Presley claims the feathers carried no religious significance to him or to his Native American religion. (Presley Decl. ¶ 14.)

The parties also disagree about what happened to Presley's religious items after he was transferred to Draper. They agree that Walter Presley, the plaintiff's father, came to Staton and picked up the items. Presley's father testified that he picked up the nine boxes,

5

never opened them, and stored them under a tarp in a shed at his house. (Walter Presley Dep. 12:11-13; 13:4-9.) Later, he delivered the nine sealed boxes back to Draper. (*Id.* 14:12-14; 15:4-8.) Presley claims, however, that he received eight boxes, which contained his hobby craft items, and one flattened, empty box, and that his heart bag and feather box, and their contents, were missing. (Presley Decl. ¶ 15.) Edwards claims that Presley's father has the items.

Presley commenced this action on July 30, 2004. On September 15, 2006, his motion to have counsel appointed was denied. (Doc. # 33). After the case survived summary judgment and trial was imminent, the court appointed counsel for Presley (Doc. # 110) and issued a new scheduling order (Doc. # 116) that allowed for additional discovery and set new deadlines, including a new deadline for dispositive motions. On February 14, 2008, the court held a pretrial conference, at which plaintiff's counsel orally agreed to waive Presley's claim for injunctive relief under RLUIPA.

## II. STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he court must view all evidence and make all reasonable inferences in favor of

6

the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### III.  DISCUSSION

Edwards contends that summary judgment should be granted as to Presley's free exercise claim because he is entitled to qualified immunity. "Qualified immunity offers

7

complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)).

Once it is established that the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to prove that qualified immunity is not warranted. *Vinyard*, 311 F.3d at 1346. The Supreme Court has articulated a two-part test for analyzing qualified immunity. First, the court must determine whether the plaintiff's allegations establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If this question is answered in the affirmative, the court's next step is to determine whether the right in question was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. In essence, a defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional. *Hope*, 536 U.S. at 741. A plaintiff can establish that the law clearly provided notice to the officers that the conduct was unconstitutional by submitting fact-specific precedents or demonstrating that the conduct "lies so obviously at the very core

of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." *See Vinyard*, 311 F.3d at 1355 (internal quotation marks and citation omitted).

Here, the parties do not dispute that Edwards was acting within his discretionary authority. The court's analysis thus focuses first on whether there was a constitutional violation and second on whether the law was clearly established.

### A.   *Constitutional Violation*

Presley contends that Edwards violated his free exercise rights by substantially burdening his practice of religion when he denied him access to his religious items. Edwards contends that he did not deny Presley access to his religious items but that Presley chose to leave his religious items at Draper. The facts surrounding the transfer of the religious items are clearly in dispute. For the purposes of this motion, the court views the evidence in the light most favorable to Presley and assumes that Edwards prohibited Presley from bringing his religious items with him when he was transferred.

For the reasons set forth in the Recommendation of the Magistrate Judge (Doc. # 47), which the court previously adopted (Doc. # 49), the court finds that Presley has alleged a violation of his free exercise rights. Edwards argues that the facts do not establish a constitutional violation, but Edwards's argument does not view the facts in the light most favorable to Presley. For example, he claims that Presley was able to practice his religion because he had a pipe after he was transferred; this statement ignores Presley's testimony that he brought an unfinished pipe to Draper and that it took him eight months to finish the pipe.

9

Edwards contends that Presley chose not to take his religious items with him, but Presley denies this allegation. Because at this stage the facts must be viewed in the light most favorable to Presley, the court finds that Presley has demonstrated a genuine issue of material fact as to whether a constitutional violation occurred.

### B.    *Clearly Established Law*

Having found a constitutional violation, the court now determines whether it was clearly established to a reasonable prison official that the arbitrary denial of an inmate's access to his religious items constitutes a violation of the First Amendment.

The plaintiff bears the burden of demonstrating that the defendant had fair warning that his conduct would violate clearly established federal law:

> To demonstrate that the law at the time clearly established that [the defendant's] conduct would violate the Constitution, [the plaintiff] might point to either (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of [the defendant's] conduct.

*Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007). The Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741 (referring to the holding in *United States v. Lanier*, 520 U.S. 529 (1997)).

The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Additionally, the Supreme Court has applied this standard to free exercise claims. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987). Presley asserts that Edwards prohibited him from bringing religious items with him to Draper when he was transferred even though he had space in his to carry those items and even though Memorandum 5-98 allowed inmates practicing Native American spirituality to bring certain religious items with them when they were transferred. As the Magistrate Judge described in his recommendation, Presley has alleged that Edwards denied him his religious items for "no legitimate and/or permissible reason." (Doc. # 47 at 22.) Taking the evidence offered by Presley as true, as the court must, Edwards arbitrarily denied Presley access to his religious items.

Since at least 1972, the Supreme Court has recognized that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). In *Cruz*, the Supreme Court found that prison officials violated the First Amendment rights of a Buddhist prisoner when they refused to allow him to hold religious services or to borrow or lend Buddhist religious books and materials. *Id.* at 320 n.1.

Moreover, Regulation 5-98, the ADOC regulation allowing inmates practicing Native American spirituality to keep feathers and pipes among their personal possessions when being transferred, resulted directly from the action filed in this district. The consent decree eventually entered in *Limbaugh* summarized (and particularized) the clearly established law

11

with respect to the practice of Native American religion in Alabama prisons. As ADOC stated, "[t]he revisions [to the policy] made have been drawn verbatim from the court document." (Pl. Ex. 4.)

Because the law was clearly established that an inmate cannot be arbitrarily denied access to his religious items, the court concludes that Edwards is not entitled to qualified immunity.

### IV. CONCLUSION

Accordingly, it is ORDERED that the defendant's Motion for Summary Judgment (Doc. # 119) is DENIED.

DONE this 20th day of February, 2007.

                                                /s/   W.  Keith Watkins  
                                           UNITED STATES DISTRICT JUDGE